**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

UNITED STATES,

                 -against-

RICHARD LUGO,

                     **Defendant.**

-------------------------------------------------------- x

**OPINION & ORDER**

**01-cr-922 (NG)**

**GERSHON, United States District Judge:**

       Defendant Richard Lugo has filed a motion seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i).  He seeks a reduction of his life sentence to a sentence of time served or a term of imprisonment not exceeding 30 years.  Lugo's request is based upon his medical condition and susceptibility to Covid-19 after a recent stroke, the 30-year sentences of his co-defendants, and his rehabilitation.  For the reasons stated below, his motion is granted, and his sentence is reduced to 25 years.

**I.      BACKGROUND**

      **a.   The Evidence at Lugo's Trial**

       According to the evidence at Lugo's trial, starting in the early 1980s, Darryl Tyler (also known as "D-Nice") ran the "D-Nice Enterprise" (the "Enterprise"), which distributed large quantities of powder and crack cocaine in New York City and, later, Baltimore.  In 1996, Tyler learned that several members of the Enterprise's operations in Baltimore—including Barry Hall ("Little Jus") and Lanny Dillard—had been selling cocaine for their own profit.  Tyler ordered them to stop.  On a visit to Baltimore soon after, Tyler was shot in an apparent assassination attempt.

The D-Nice Enterprise declared war on the now rival "Little Jus crew."  They sought to avenge the attempt on Tyler's life by killing Little Jus, Lanny Dillard, and other members of the crew.  The ensuing turf war led to several violent confrontations.  As a result, Tyler hired gunmen Michael McMillan and Kenneth Watson to provide security for the Enterprise's operations.  In 1998, when Tyler and Erwin Stokes, one of his trusted lieutenants, encountered Dillard, Tyler accused Dillard of attempting to kill him and his brother, Eric Steel ("Tweety").  Less than a month later, on November 16, 1998, Tweety was shot and killed by two unknown assailants.

Believing that the Little Jus crew was responsible for Tweety's murder, the D-Nice Enterprise hired Richard Lugo and his brother Daniel Lugo (the "Lugo brothers") to seek out and kill members of the rival drug operation.  On several occasions, Tyler gave Richard Lugo money as a down payment for their services.  Eventually, the D-Nice Enterprise learned, and advised the Lugo brothers, that members of the Little Jus crew were likely attending a party in Manhattan on December 26, 1998.  On that night, Tyler, Stokes, and other members of the D-Nice Enterprise met the Lugo brothers at a nearby pool hall.  Tyler instructed Dwayne Hunter, an associate, to search the party for members of the Little Jus crew, and Hunter called to confirm that Dillard was in attendance.  In the early morning hours of December 27, 1998, Dillard was shot and killed as he left the party with his wife and family.

Shortly after Dillard's murder, Tyler, Stokes, and other D-Nice Enterprise members met Daniel Lugo at a restaurant and gave him an envelope containing cash.  A few days later, Tyler gave an additional payment to Richard Lugo at another meeting near the restaurant.  At Tyler's direction, Stokes then delivered two guns to Richard Lugo at Lugo's apartment.  Lugo told Stokes that he could kill other members of the Little Jus crew for an additional $60,000.  Stokes later delivered a few ounces of heroin to Lugo.  During that meeting, Lugo questioned Stokes about the

whereabouts of other members of the Little Jus crew.  After Lugo complained to Tyler about the quality of the heroin, Stokes returned to collect the drugs.  At this encounter, Lugo sought Stokes's approval to kill another member of the Little Jus crew, but Stokes informed him that only Tyler could give him permission to carry out the hit.

### b.  Indictments and Arrests

On August 15, 2001, a grand jury returned an indictment charging Tyler, McMillan, Watson, Hunter, Tonya Foster (another one of Tyler's associates), Richard Lugo, and Daniel Lugo with various crimes, including racketeering, racketeering conspiracy, narcotics conspiracy, firearms offenses, and two violent crimes in aid of racketeering ("VICAR")—the murder of Lanny Dillard and the conspiracy to murder other members of the Little Jus crew.  Each defendant was arrested in October 2001, except for Richard Lugo, who was arrested in January 2003.

On June 7, 2002, a grand jury returned a superseding indictment against Tyler, McMillan, Watson, Daniel Lugo, and Richard Lugo.  And, on November 17, 2003, after Richard Lugo's arrest, a grand jury returned a second superseding indictment charging him with two crimes under VICAR—conspiracy to commit murder in violation of 18 U.S.C. § 1959(a)(5) ("Count One") and murder in violation of 18 U.S.C. § 1959(a)(1) ("Count Two").  He was also charged with using a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) ("Count Three").  Each of these offenses arose out of Lanny Dillard's murder, although Count One charged Lugo with also conspiring to kill other members of the Little Jus crew.

Until the eve of Richard Lugo's trial, the government offered him the opportunity to plead guilty to a single conspiracy charge in exchange for a sentence of 10 years, but he rejected this offer.

### c.  Lugo's Conviction, Sentence, and Post-Conviction Proceedings

On January 12, 2004, after a four-week trial before me, a jury convicted Lugo of Counts

One, Two, and Three.  I had instructed the jury that it could find Lugo guilty of VICAR murder

(Count Two) under three alternate theories of liability: (1) that Lugo personally committed

Dillard's murder; (2) that Lugo aided and abetted Daniel Lugo in committing the murder; or (3)

that Lugo was responsible under a *Pinkerton* theory of liability.[1]  When it rendered its verdict, the

jury was not required to reveal upon which theory it had relied to convict Lugo.

On July 22, 2005, I sentenced Lugo to a statutory mandatory life term of imprisonment on

the VICAR murder charge, a concurrent 10-year term on the VICAR conspiracy to murder charge,

and a mandatory consecutive 10-year term on the firearms charge.  I also imposed a sentence of

three years of supervised release for the VICAR murder and firearms charges and two years for

the VICAR conspiracy to murder charge, all to run concurrently.

Lugo unsuccessfully challenged his conviction on direct appeal and through motions under

28 U.S.C. § 2255.  The lengthy post-conviction procedural history is set forth in my decision, dated

May 14, 2021, denying Lugo's most recent § 2255 motion.  *Lugo v. United States*, 2021 WL

6883419, at *2 (E.D.N.Y. May 14, 2021).  On December 6, 2021, the Second Circuit denied

Lugo's motion for a certificate of appealability to challenge that decision.  *Lugo v. United States*,

21-1406, Dkt. No. 601 (2d Cir. Dec. 6, 2021).

---

[1] Under the *Pinkerton* doctrine, "a jury [may] find a defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy." *United States v. Miley*, 513 F.2d 1191, 1208 (2d Cir. 1975) (citing *Pinkerton v. United States*, 328 U.S. 640, 645 (1946)).

4

### d. Lugo's Criminal History

Lugo's criminal history dates back to 1976, when he was 17.[2] From then until the age of 19, he was arrested for a series of offenses, many of which involved violence. In 1976, for example, he was convicted of attempted grand larceny in Kings County Criminal Court after he and another person struck the complainant in the head and attempted to steal his watch. That same year, Lugo was convicted of criminal mischief in Kings County Criminal Court after he and four others broke the window and headlights, and slashed the tires, of the complainant's car in an attempt to prevent him from testifying in a criminal case. And, in 1979, Lugo was also convicted of attempted grand larceny in Kings County Criminal Court after he and his co-defendant beat the complainant while trying to steal his necklace.

In 1981, Lugo was convicted of his first felonies. First, he was sentenced to one and a half to four and a half years for a conviction of attempted robbery in New York County Supreme Court after he, along with three others, placed a gun to a police officer's head and ordered him out of his vehicle. The officer fired on the perpetrators, killing one of them and injuring Lugo. Second, Lugo was sentenced to a concurrent term of two to six years for convictions of robbery in the second degree and criminal use of a firearm in Kings County Supreme Court after he and his co-defendant robbed the complainant and his friend of a radio at gunpoint.

In 1986, Lugo was sentenced to three and a half to seven years for a conviction of criminal possession of a weapon in the third degree in New York County Supreme Court; the police had found a weapon in his car after Lugo refused to obey a request for a traffic stop and then engaged in a high speed chase, during which he, among other dangerous acts, attempted to run over an

---

[2] For purposes of this decision, I assume that Lugo was born in 1959, the year listed on records from the Bureau of Prisons ("BOP"). I note, however, that the Presentence Investigation Report lists his year of birth as 1960.

officer at a blockade.  In 1994, he was sentenced to one year for a conviction of criminal possession of a weapon in Kings County Supreme Court after the police found three guns as well as crack cocaine in a car in which he was a passenger.  From 1994 to 1999, Lugo was convicted of four misdemeanors, three for drug possession and one for petit larceny.

### e.  Lugo's Co-Defendants' Convictions, Sentences, Post-Conviction Proceedings, and Criminal Histories

Daniel Lugo and three members of the D-Nice Enterprise—Tyler, McMillan, and Watson—were tried at a separate trial before the Honorable Jack B. Weinstein in the summer of 2002.  Daniel Lugo was charged with the same offenses as his brother.  The jury found him guilty of VICAR conspiracy to commit murder, but, unlike his brother, he was acquitted of VICAR murder and of the use and possession of a firearm in furtherance of a crime of violence.  Judge Weinstein sentenced Daniel Lugo to 10 years in custody and five years of supervised release.  The judge ordered that the sentence be served consecutively to a New York State sentence of six to 12 years imposed on Daniel Lugo for conspiracy in the second degree and criminal possession of a controlled substance in the third degree.  Daniel Lugo was released from federal custody on September 1, 2017.

At trial, Tyler, McMillan, and Watson were acquitted of VICAR murder, but Tyler and Watson were convicted of VICAR conspiracy to commit murder, and all three were convicted of racketeering, racketeering conspiracy, and narcotics conspiracy.  With respect to racketeering and conspiracy to commit racketeering, Tyler and Watson were found guilty of the following racketeering acts in violation of 18 U.S.C. § 1962(c): conspiring to distribute and possess with intent to distribute crack and cocaine, conspiracy to commit the murder of members of the Little Jus crew, and the murder of Dillard.  McMillan was found guilty of the latter two acts.

On December 17, 2002, under the Sentencing Guidelines, which were then considered mandatory, Judge Weinstein sentenced Tyler, McMillan, and Watson each to life imprisonment. In imposing the sentence on Tyler, Judge Weinstein described him as "engaged for many years in a criminal enterprise that was essentially brutal.  People were beaten, shot at, and eventually killed. The murder of his brother, he was killed partly for revenge, but also partly because as the leader of this gang, [Tyler] couldn't tolerate this assault on his personal authority." *United States v. Tyler*, 01-cr-922, Dkt. No. 433-2 at 31 (Dec. 17, 2002).

In 2005, on remand after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), which held that the Sentencing Guidelines are advisory, Judge Weinstein resentenced Tyler, McMillan, and Watson each to a non-Guidelines sentence of 30 years.[3]

### f.   Tyler's, McMillan's, and Watson's Criminal Histories

Tyler, McMillan, and Watson each had criminal records before they were charged in this case.   Tyler's was the least severe.  He was convicted in 1981 of assault and criminal possession of a weapon in Kings County Supreme Court and served a sentence of four and a half years, and he had two subsequent convictions for disorderly conduct that involved drug possession.

McMillan's criminal record included, among several other convictions, a 1977 conviction for grand larceny in the third degree in Kings County Supreme Court for which he was sentenced to three years; a 1981 conviction for attempted murder in the second degree and criminal possession of a weapon in the second degree in Kings County Supreme Court in which the victim was a police officer and for which he was sentenced to 22 years; and a 2000 conviction for

---

[3] As to Lugo's other co-defendants, Hunter was sentenced to time served after pleading guilty to VICAR murder, and Foster was sentenced to five years of probation after pleading guilty to conspiring to distribute and to possess with intent to distribute cocaine.  Stokes, who pleaded guilty to VICAR murder and narcotics conspiracy after waiving indictment, was sentenced to three years of incarceration.

attempted arson in the second degree in Kings County Supreme Court for which he was sentenced to eight and a half years.  He was serving the latter sentence when he was arrested for the offenses at issue here.

Finally, Watson had a lengthy and violent criminal history.  For example, in 1985, he was convicted in New York County Supreme Court of manslaughter and criminal use of a firearm and sentenced to nine to 18 years.  He also was convicted in 1986 of two counts of robbery (each involving the use of a gun) in Kings County Supreme Court and sentenced to five to 15 years.  And, in November 2002, a month prior to his initial sentencing proceeding before Judge Weinstein, Watson was sentenced to 25 years to life after he was convicted of second-degree murder in Kings County Supreme Court.

### g.  Lugo's Request for Compassionate Release

On May 5, 2021, Lugo emailed the warden of USP Allenwood, the prison in which he is incarcerated, seeking compassionate release.  He wrote that he was entitled to compassionate release "because (1) my convictions and sentence are unconstitutional and invalid (2) the harshness of the sentences (3) harsh prison conditions and health risks associated with Covid-19 (4) age, and serious health issues."  Email of Richard Lugo (May 5, 2021), Dkt. No. 596-3 at 2.  The warden did not respond.

On November 2, 2021, Lugo filed this motion.  The government submitted its opposition on December 7, 2021, and Lugo replied on December 16, 2021.  In the weeks since, Lugo has sent three letters, two of which provided updates on the status of Covid-19 cases at USP Allenwood and one of which was a commitment letter of reasonable assurance from Brooklyn Defender Services ("BDS").

### h.  Lugo's Medical Condition

According to the medical records submitted by Lugo and the government, Lugo has been in relatively good health for most of the time he has been incarcerated.  While he tested positive for Covid-19 on November 17, 2020, he experienced mild symptoms.  Afterward, he was vaccinated against the virus, receiving his first dose of the Moderna vaccine on January 7, 2021 and his second on February 4, 2021.

On February 17, 2021, however, Lugo suffered a stroke.  A prison medical record from a sick call at 8:00 a.m. reports that, during the night, Lugo had experienced weakness, dizziness, nausea, and multiple episodes of vomiting and diarrhea.  According to Lugo's own account, after he threw up about 32 times and defecated on himself at night, he hit the emergency button, but the officers who responded did not offer him help.  Lugo claimed that he did not get the attention he needed until 6:00 a.m., when another officer opened his cell door and some of his friends saw him, picked him up, and brought him to the prison's medical staff.  When he received medical attention, Lugo was transported by ambulance to Evangelical Community Hospital where it was confirmed that he had suffered a stroke.  He returned to USP Allenwood on February 21, 2021 with instructions from the hospital to, among other things, eat healthy foods and exercise at least 30 minutes a day at least five days a week.

In the months since his stroke, Lugo has complained frequently to prison medical staff about recurring episodes of dizziness and shortness of breath.  On May 15, 2021, these symptoms, along with chest pain, required him to be transported to health services in a wheelchair.  That same month, Lugo was evaluated by a neurologist, Dr. Stuart Olinsky, who wondered if Lugo was having "bilateral small cerebellar strokes from a clot secondary to new onset atrial fibrillation." Dkt. No. 603-1 at 2.  The doctor speculated that the cause of Lugo's stroke could have been his

prior Covid-19 infection or—less likely—his Covid-19 vaccination.[4]  Dr. Olinsky requested to review Lugo's medical records from Evangelical Community Hospital to determine if they included a brain MRI, echocardiogram ("EKG"), and carotid ultrasounds.   The hospital records were faxed to Dr. Olinsky on May 13, 2021, but he did not review them until August 2021.  Then, after learning that Lugo had not had an MRI done at the time of his stroke, Dr. Olinsky prescribed an MRI of Lugo's brain, a carotid ultrasound, and physical therapy.

Lugo's more recent medical records show improvement.   At a physical therapy appointment on September 21, 2021, he reported that his dizziness and difficulty breathing had previously occurred daily, but they had subsided to a few times a week.  He also told his physical therapist that he had resumed exercising and did about 100 burpees each day.[5]  The findings from an MRI of Lugo's brain on October 22, 2021 were summarized as "No acute intracranial abnormality.  Specifically no acute ischemia.  Sequelae of old bilateral inferior cerebellar infarcts." And an EKG performed on September 13, 2021 was normal.

### i.   Lugo's Conduct in Prison

In a letter to the court dated May 20, 2021, Lugo writes,

> I have taken my rehabilitation very seriously and have worked extremely hard to transform my character into an acceptable and productive human being.  Simply put, I'm not the same man who was arrested 18 years ago.  My anti-social attitude and behavior which followed me into the prison system has since been eradicated as I resolved in my heart to change myself into the man I am today.  I have become a role model for prisoners.  I'm community minded and make it a point to encourage fellow prisoners to live a positive life and promote rehabilitation in order to break the chains of recidivism.

---

[4] Lugo cites studies that have found that both Covid-19 and the vaccine against it can cause strokes.

[5] A burpee is an exercise involving four steps: Starting in a standing position, a person moves into a squat position with his or her hands on the ground, kicks his or her feet back into an extended plank position, immediately returns to a squat position, and then stands up.   Wikipedia.com, *Burpee (exercise)*, https://en.wikipedia.org/wiki/Burpee_(exercise) (last visited Mar. 7, 2022).

Letter from Richard Lugo (May 20, 2021), Dkt. No. 596-1 at 2.

Lugo's prison records corroborate his assertions.  Although he has been cited for 15 disciplinary infractions, all but one of them occurred prior to 2014.  His most serious infractions took place over 10 years ago:  in January 2004, he was sanctioned for fighting with another person, and, in both May 2007 and April 2010, he was disciplined for possessing a dangerous weapon. Lugo's most recent infraction—his only one since October 2013—did not involve any violence. He was cited for possessing a "brown leafy substance" in a bag in a secured locker.

Lugo's BOP transcript shows that he has focused on his education for nearly a decade.  In 2006 and 2011, he completed a total of three courses, all in physical education.  But, between 2012 and early 2021, he completed over 80 programs on a wide variety of subjects, including algebra, gender equality, the skeletal system, World Wars I and II, small business administration, and financial management.

Two members of the prison staff who have worked recently with Lugo submitted letters on his behalf.  Terra Sechrist, a Health Information Technician at USP Allenwood, supervised Lugo when he worked as a Health Services Orderly and Blood Spill Clean Up Orderly in 2020.  She wrote that Lugo "requires little supervision, drives himself exceptionally hard all the time and does superior work.  He is completely dependable in all things expected of him and received outstanding monthly performance ratings."  Letter from Terra Sechrist (July 9, 2021), Dkt. No. 596-4 at 3.  She further credited Lugo with "working to keep our Health Services department in tip top shape during the COVID pandemic."  *Id.*  And she concluded, "I have no doubt that if given the opportunity to return to the community he would become a productive member of society."  *Id.*  In March 2021, Lugo enrolled in Introduction to Culinary Arts.  His instructor, B. Toomey, described Lugo as dedicated to the program, respectful, and dutiful in completing all tasks.  B. Toomey further shared

that Lugo assists another student in the class who has a language barrier—by translating for the student and assisting him with "self-study outside of the program hours." Letter from B. Toomey, Dkt. No. 596-4 at 2.

Finally, four people incarcerated with Lugo submitted letters supporting Lugo. They depicted Lugo as a mentor to younger inmates and a mediator of disputes. Kirk James, for example, wrote, "If I would of met Lugo along time ago I know I wouldn't been in prison now." Letter from Kirk James (Aug. 1, 2021), Dkt. No. 596-4 at 6. And Jorge A. Martinez described Lugo as "selfless to his fault sharing his little property with inmates of every race excepting nothing in return, including myself." Letter from Jorge A. Martinez (Sept. 1, 2021), Dkt. No. 596-4 at 5.

### j.   Covid-19 Cases and Mitigation Measures at USP Allenwood

On January 3, 2022, 110 inmates and 1 staff member had active Covid-19 infections at USP Allenwood. On January 28, 2022, the numbers were significantly lower: 13 inmates and 1 staff member. By March 7, 2022, no inmates or staff members were infected. On that same date, however, USP Allenwood was operating at a Covid-19 operational Level 3, the most severe operational level, which indicates that the medical isolation rate is at or more than seven percent, the facility vaccination rate is less than 50 percent, or the community transmission rate is at or greater than 100 per 100,000 over the last seven days. COVID-19 Operational Levels, BOP, www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited Mar. 7, 2022). Under Level 3 operations, inmates may move around the facility only for commissary, laundry, showers three times each week, and telephone. *See United States v. Terry*, 2021 WL 4226053, at *6 (E.D. Tex. Sept. 15, 2021). As Lugo notes, recreation and exercise are absent from this list. According to Lugo, during this latest nationwide surge of Covid-19 cases, USP Allenwood was subject to strict restrictions as early as October 18, 2021.

12

These restrictions, of course, are not new.  During the nearly two years that the United States has been under the grip of this virus, the BOP has taken various measures to reduce its spread in its facilities.  As an example, all facilities suspended inmates' ability to receive visits from friends and family from March 2020 to October 2020.  United States Government Accountability Office, *Report to Congressional Addresses*, at 36, 38 (July 2021), www.gao.gov/assets/gao-21-502.pdf.[6]

### k.  Letters of Support from Family and Community Members

In addition to the inmates and prison staff mentioned above, twenty people—consisting of Lugo's family members, his friends, and members of the community—have submitted letters in support of Lugo's motion.  Tyrana Carter, with whom Lugo would reside in Brooklyn if he were released, is one of these people.  In her letter, Ms. Carter, Lugo's long-time friend and the mother of one of his three children, described Lugo as an integral part of his large family who—despite being in prison—encourages other family members to avoid prison.  In another letter, Daniel Lugo, Richard Lugo's brother and co-defendant, explained that Lugo was a substantial source of emotional support for him during his transition home from prison in 2017.  Daniel Lugo credited Lugo with his decision to reenroll in college, where he is majoring in construction management.  Daniel Lugo also wrote that he has started a construction company and that he hopes that his brother can help him with it upon his release.

Shania Lugo, one of Lugo's grandchildren, wrote that Lugo was "[t]he main person" who supported her decision to attend Stony Brook University to pursue a career as a physician.  Letter

---

[6] Lugo further notes that there has been resistance to vaccination among BOP staff.  He cites a news article from October 15, 2021, reporting that corrections officers at USP Allenwood engaged in a protest to challenge the vaccine mandate.  *See* Fox56 Newsroom, *Corrections workers protest Biden vaccine mandate*, Oct. 15, 2021, https://fox56.com/news/local/corrections-workers-protest-biden-vaccine-mandate.

of Shania Lugo, Dkt. No. 596-4, at 15.  Mariah Lopez, a transgender activist who is also Lugo's niece, wrote about Lugo's support for her activism and his suggestion to use anti-violence work to educate young men of color about the rights of the TLGBQ+ community.  Avianca Carter, Lugo's stepdaughter and a correction officer at Rikers Island, also offered her and her family's support if he were to be released.  Tyrone Nichols, who owns a construction company and has known Lugo and his family for most of his life, pledged to employ Lugo upon his release.  In addition, Ed Brown, the President of Team Brown Consulting, which assists people who have been released from prison to transition back into the community, offered to provide Lugo with construction job training and placement in addition to emotional support.  Lastly, the Reentry Unit of BDS, a public defender organization with which Lugo has been in contact for several years, submitted a letter committing to assist Lugo with his reintegration into society.

## II.   STANDARD OF REVIEW

Prior to the First Step Act ("the Act"), 18 U.S.C. § 3582(c)(1)(A)(i) gave the BOP "exclusive power over all avenues of compassionate release."  *United States v. Brooker*, 976 F.3d 228, 231 (2d Cir. 2020).  With the passage of the Act, the section was amended to allow defendants to bring motions themselves and to give courts the power to grant such motions, "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable," so long as "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i).  In amending § 3582(c)(1)(A)(i), Congress "freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in [such] motions."  *Brooker*, 976 F.3d at 237.  As a result, "courts have used their discretion and their intimate knowledge of individual defendants' cases to further the purpose of the

14

compassionate release statute – to reduce terms of incarceration based upon a consideration of a defendant's unique circumstances." *United States v. Ball*, 2021 WL 2351088, at *4 (E.D. Mich. June 9, 2021).

"It bears remembering that compassionate release is a misnomer," as "§ 3582(c)(1)(A) in fact speaks of sentence reductions." *Brooker*, 976 F.3d at 237.  In granting a motion, "[a] district court could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place." *Id.*

The defendant bears the burden of showing that he is entitled to compassionate release. *See, e.g.*, *United States v. Martinez*, 2021 WL 3374530, at *2 (S.D.N.Y. Aug. 2, 2021).[7]

## III.   DISCUSSION

### a.   Extraordinary and Compelling Circumstances

Lugo, who is 63 years old, cites three reasons to support his request for a sentence reduction to either time served or no more than 30 years: (1) his stroke and resultant vulnerability to Covid-19, (2) the disparity of his sentence compared to the 30-year sentences of his co-defendants Tyler, McMillan, and Watson, and (3) his rehabilitation.  As discussed below, I conclude that these factors support lowering Lugo's sentence.  *See Brooker*, 976 F.3d at 238 (factors "in . . . combination" may establish extraordinary and compelling reasons for a sentence reduction).

---

[7] A court may not modify a term of imprisonment under the Act until "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C § 3582(c)(1)(A).  The Second Circuit has concluded that the statute does not impose a jurisdictional requirement, but rather a claims-processing rule that may be waived or forfeited by the government.  *United States v. Saladino*, 7 F.4th 120 (2d Cir. 2021).  Here, by not asserting that Lugo's claim is unexhausted, the government has waived any argument that he has not met the exhaustion requirement.  *See id.*  In any event, Lugo has fulfilled § 3582(c)(1)(A)'s requirement.  He sent a letter to the warden of his facility on May 5, 2021 and never received a response.  For these reasons, I address Lugo's claim on the merits.

The most compelling factor is the stark disparity between Lugo's life sentence and the 30-year sentences imposed on Tyler, McMillan, and Watson, even though these men were convicted of behavior that was similarly egregious.  Tyler was the leader of the D-Nice Enterprise, a large drug and violent organization, and he orchestrated the Lugo brothers' murder of Lanny Dillard—a killing intended to exact revenge.  In particular, it was Tyler who decided on the murder and, with the others, hired the Lugo brothers to effectuate his plan.

Lugo's lengthy and violent criminal history does not distinguish him from these three co-defendants.  Tyler, who led a criminal enterprise that was, according to Judge Weinstein, "essentially brutal," was previously convicted of assault and criminal possession of a weapon. McMillan had been convicted, among other serious offenses, of attempted second-degree murder of a police officer and attempted second-degree arson.  And Watson had served time for, among other crimes, robbery and manslaughter, and was sentenced on a second-degree murder conviction just before Judge Weinstein sentenced him in this case.

In short, I see no reason for Lugo to serve a sentence that requires him to die in prison while these other men serve 30 years.  The First Step Act allows me to rectify this disparity.  *See United States v. Eccleston*, __ F. Supp. 3d __, 2021 WL 5506754, at *3–4 (D. Md. Nov. 24, 2021); *Ball*, 2021 WL 2351088, at *5; *United States v. Ferguson*, 536 F. Supp. 3d 139, 143−44 (E.D. Mich. 2021); *United States v. Edwards*, 2021 WL 1575276, at *2 (D. Md. Apr. 22, 2021).

Lugo's conduct in prison over the past decade also supports a sentence reduction as it demonstrates that he is likely to lead a law-abiding life once released.[8]  Lugo has taken numerous and varied academic courses, is lauded by his supervisors, and has maintained a nearly spotless

---

[8] Although the Act prohibits a court to rely on rehabilitation alone as an extraordinary and compelling circumstance, *Brooker*, 976 F.3d at 237–38 (citing 28 U.S.C. § 994(t)), rehabilitation can be one of many circumstances supporting a defendant's release.

disciplinary record for nine years.  In addition, letters from other inmates and his family describe Lugo as a peacemaker, a mentor who tries to keep people on the right path, and a motivator.  Lugo's commendable behavior is especially significant because his life sentence eliminated any extrinsic motivation to earn good time credit and to acquire new skills and knowledge.  *See United States v. Cabrera*, 2021 WL 3046824, at *1 (D. Mass. June 28, 2021); *United States v. Cruz*, 2021 WL 1326851, at *13 (D. Conn. Apr. 9, 2021).

Also, Lugo will return to the community with a large network of support consisting of family, friends, acquaintances, and service providers, all of whom are eager to help him smoothly transition back into the community, including through offers of employment.  *See United States v. Reid*, 2021 WL 837321, at *7 (E.D.N.Y. Mar. 5, 2021); *United States v. Mapp*, 467 F. Supp. 3d 63, 66 (E.D.N.Y. 2020); *United States v. Caminos*, 472 F. Supp. 3d 802, 806 (D. Haw. 2020).

Finally, Lugo's age, health condition, and Covid-19 vulnerability support a sentence reduction, as discussed more fully below.

### b.  Section 3553 Factors

The government argues that the § 3553(a) sentencing factors weigh against granting Lugo relief.  The First Step Act requires that I consider whether a reduced sentence would be consistent with these factors, which include "the nature and circumstances of the offense and the history and characteristics of the defendant;" the need to promote respect for the law and provide just punishment for the offense, to afford adequate deterrence to criminal behavior, to protect the public, and to provide the defendant with proper care; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" the sentencing guidelines; and "the need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a).

Here, the gravity of Lugo's offense cannot be overstated. "There is no crime more serious than murder." *Cruz*, 2021 WL 1326851, at *12. In addition, Lugo has a lengthy criminal history that involves numerous violent crimes. These factors support a severe sentence. But Lugo's behavior in prison over the past decade shows that he has worked to educate himself and to develop skills to lead a law-abiding life were he to be released. He also has the strong support of numerous family members, friends, and community members. And, since none of his co-defendants—who also have lengthy and violent criminal records—will serve more than 30 years for at least equally egregious behavior, reducing Lugo's sentence will rectify the extreme disparity of his life sentence.

The government argues that Tyler's, McMillan's, and Watson's shorter sentences are irrelevant to this motion because they were convicted under § 1962(c) while Lugo was convicted under § 1959(a)(1). It contends that, because Lugo's life sentence was the mandatory minimum, lowering it would create sentencing disparities for other defendants convicted under § 1959(a)(1). It also argues that, if Lugo's sentence were reduced, it would send a message that "committing murder in exchange for money, drugs, and guns . . . does not merit significant prison sentences." Opp. at 9.

The government correctly notes that "section 3553(a)(6) requires a district court to consider nationwide sentence disparities." *See United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007), *abrogated on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007) (citing *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006)). But the court also may consider disparities between co-defendants in choosing the appropriate sentence. *Id.*; *accord United States v. Stewart,* 590 F.3d 93, 140 (2d Cir. 2009); *Cardenas*, 2021 WL 3722761, at *3; *United States v. Lewis*, 2021 WL 3292180, at *2 (S.D.N.Y. Aug. 2, 2021). Here, the disparity between co-defendants strongly favors a sentence reduction.

18

While Lugo was convicted under a statute that requires a mandatory life sentence and Tyler, McMillan, and Watson were not, I cannot ignore the fact that all four men were convicted of murdering Lanny Dillard.  Tyler, in fact, ordered the execution.  Tellingly, the government makes no attempt to show that the conduct that led to Lugo's conviction was any more culpable than that of Tyler, McMillan, or Watson.  Nor does it assert that Lugo's criminal history or conduct in prison distinguishes him from these three men.  Indeed, Lugo was not charged under § 1962(c) because there was no evidence that he was a member of the violent and vindictive D'Nice Enterprise—a fact that should work in his favor, not justify a sentence longer than those imposed on enterprise members.  *See Lewis*, 2021 WL 3292180, at *2.  Further, the government's emphasis on the importance of Lugo's life sentence in deterring others from engaging in behavior like Lugo's is undercut by its willingness to offer Lugo, until the eve of trial, a plea that would have resulted in a 10-year sentence.

### c. Length of the Reduced Sentence

Having found that Lugo's sentence should be reduced, I now must determine by how much.  As mentioned above, Lugo requests that I sentence him to time served or no more than 30 years.

Lugo's vulnerability to Covid-19 as a result of his recent stroke is the only circumstance he cites that could justify a sentence of time served.  I do not downplay the seriousness of Lugo's stroke, the fear he undoubtedly experienced in his cell before he received medical attention, and the symptoms that he has had since his stroke.  Nor do I deny that Lugo's history of a stroke increases his vulnerability to Covid-19.  *See* Centers for Disease Control and Prevention, *People with Certain Medical Conditions*, www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Mar. 7, 2022).  Moreover, I am troubled that the BOP has not yet offered him, at age 63, a booster dose.  Yet, Lugo's receipt of

the initial two doses of the vaccine offers strong protection against severe illness and death against Covid-19, including the Omicron variant. *See United States v. Vasquez*, 2022 WL 119233, at *4 (D. Conn. Jan. 12, 2022). Thus, while Lugo's medical condition supports a sentence reduction, it does not support a sentence of time served.

Lugo will be resentenced to 25 years of incarceration. This sentence accounts for the factors described above as well as for the suffering that Lugo has experienced, and likely will continue to experience, while incarcerated during a lengthy and ongoing pandemic.[9] Notably, a 25-year sentence is still higher than the recent average federal sentence for murder, which is slightly over 20 years. U.S. Sentencing Commission, Preliminary FY21 4th Quarterly Sentencing at 9 (Dec. 7, 2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report _4th_ FY21.pdf.

---

[9] For the past two years, inmates at all BOP facilities have been subject to lockdowns as well as long periods in which they could not see visitors. *See United States v. Cardenas*, 2021 WL 3722761, at *2 (S.D.N.Y. Aug. 23, 2021). For example, as a result of the latest surge in cases, Allenwood USP is currently under severe restrictions in which movement around the prison is limited. These restrictions, as other courts have recognized, render Lugo's time in prison "much more onerous than the Court contemplated when it sentenced him." *See United States v. Tucker*, 2021 WL 3722750, at *3 (S.D.N.Y. Aug. 23, 2021); *accord United States v. Hatcher*, 2021 WL 1535310, at *3 (S.D.N.Y. Apr. 19, 2021). "[A] day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." *United States v. Mcrae*, 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021); *accord United States v. Ng Lap Seng*, 2021 WL 961749, at *6 (S.D.N.Y. Mar. 15, 2021); *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020).

## IV.    CONCLUSION

For the reasons stated above, Lugo's motion for compassionate release is granted.   His

sentence is reduced to 25 years and seven years of supervised release.   A revised judgment of

conviction will be entered.

**SO ORDERED.**

                           **___/S/_____**
                           **NINA GERSHON**
                           **United States District Judge**

March 11, 2022
Brooklyn, New York